# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### MARTINSBURG

**DANIEL WAYNE SALISBURY, SR.,**

        Plaintiff**,**

**v.**

        **CIVIL ACTION NO.: 3:16-CV-173 (GROH)**

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

        Defendant.

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION

On December 28, 2016, Plaintiff Daniel Wayne Salisbury, Sr. ("Plaintiff"), by counsel Brian Bailey, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security[1] ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1). On March 7, 2017, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 7; Admin. R., ECF No. 8). On April 4, 2017, and April 25, 2017, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 10; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 12). Following review of the motions by the parties and the

---

[1] After this suit was filed, but before this Order was entered, Nancy A. Berryhill replaced Commissioner Carolyn W. Colvin as the Acting Commissioner of Social Security. Accordingly, pursuant to Rule 25(d), Fed. R. Civ. P., and 42 U.S.C. § 405(g), Nancy A. Berryhill is substituted for Carolyn W. Colvin.

administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II. PROCEDURAL HISTORY

On October 25, 2013, Plaintiff protectively filed his first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and widow's disability benefits ("WDIB"), and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on October 14, 2008. (R. 264). Plaintiff's earnings record shows that he acquired sufficient quarters of coverage to remain insured through June 30, 2012 (R. 297); therefore, Plaintiff must establish disability on or before this date (R. 41). This claim was initially denied on January 21, 2014 (R. 189) and denied again upon reconsideration on April 15, 2014 (R. 210). On April 23, 2014, Plaintiff filed a written request for a hearing (R. 219), which was held before United States Administrative Law Judge ("ALJ") Jeffrey P. La Vicka on November 17, 2015 in Morgantown, West Virginia. (R. 38). Plaintiff, represented by counsel Brian Bailey, Esq., appeared and testified, as did Casey Vass, an impartial vocational expert. Id. On November 23, 2015, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 16). On November 8, 2016, the Appeals Council denied Plaintiff's request for review (R. 1), making the ALJ's decision the final decision of the Commissioner.

## III. BACKGROUND

### A. Personal History

Plaintiff was born on May 19, 1963, and was 50 years old at the time he filed his claim. (R. 264). He obtained his GED (R. 51). Plaintiff's prior work experience included a boiler operator (2000-2006), laborer at a lumber company (2006-2007), and maintenance and stocking

shelves at Wal-Mart (2007-2009). (R. 53). He was widowed at the time he filed his initial claim (R. 264) and was widowed at the time of the administrative hearing. (R. 38). He has two adult children, but no dependent children. (R. 43-44). Plaintiff alleges disability based on "depression, anxiety, suicidal, back problems, leg problems, PTSD, diabetic, oxygen use, COPD, [and] obese." (R. 301).

**B.    Relevant Medical History**

Plaintiff began care with Arbor Medical Associates in February of 2010. Physician's assistant Christie Shoemaker noted after an initial intake appointment on February 22, 2010 that Plaintiff had been going to Chestnut Ridge for mental health treatment "over the last couple of years" for post-traumatic stress disorder ("PTSD") after witnessing his wife's suicide. (R. 432). PA-C Shoemaker also noted that "[Plaintiff] has been diagnosed as being bipolar and does take Buspar, Seroquel, Doxepin, and Zoloft." Id. At that time, Plaintiff was having "significant issues" with his blood pressure, pain in his hand after amputation of his right ring finger, and back pain. Id. Plaintiff needed prescription refills, including Hydrocodone for pain. Id.

Subsequently, Plaintiff returned to Arbor Medical to see Dr. Eric Anger on March 12, 2010. (R. 431).  Dr. Anger noted obesity, and that Plaintiff's history also included a fall from a roof, and a suicide attempt two years ago. Id. Dr. Anger noted that Plaintiff had tried multiple medications and a TENS unit for his chronic back pain, none of which were effective. Id. Dr. Anger directed Plaintiff to continue to follow with Chestnut Ridge for treatment of his bipolar disorder. (R. 432). He also prescribed an increased dosage of Lortab for Plaintiff's low back pain and adjusted his blood pressure medications. Id.

At followup on May 7, 2010, Plaintiff continued to have "moderate to severe" low back pain, for which pain medications "t[ook] the edge off." (R. 430). At this visit, lower extremities

were without edema (swelling), and Plaintiff's range of motion in his lumbar spine was decreased. Id. On July 9, 2010, Plaintiff's low back pain was "severe at times" and "not controlled with current pain med[ication dosage]." (R. 429). Dr. Anger increased Plaintiff's pain medication (Lorcet) for continued low back pain, and increased Plaintiff's Seroquel for anxiety/depression, noting Plaintiff's depression has been "slightly worse." (R. 429-430). On October 12, 2010, Plaintiff's depression was "somewhat better," but back pain continued with additional pain in "both heels." (R. 428). On December 13, 2010, Plaintiff continued to complain of "chronic low back [pain] radiating into [his] hips," reporting that his pain had been worse in the last few days. (R. 427). The pain was "achy, constant," and present upon waking, though clearing up after "about an hour." Id. Diagnoses at that visit included chronic lower back pain, anxiety and depression (major), and claudication (pain and/or cramping in the lower leg due to inadequate blood flow to the muscles). Id.

By March 14, 2011, Plaintiff reported that the Seroquel he had been taking for his anxiety and depression had side effects ("wiped [him] out" he could not tolerate, although he did "do ok[ay] on extended release medications." (R. 426). It was unclear from Dr. Anger's notes whether these extended release medications were for depression and anxiety, or something else. In addition to existing circulation issues already diagnosed (claudication), Plaintiff also reported erectile dysfunction as well. (R. 425). On June 14, 2011, Plaintiff reported that Hydrocodone was giving "significant relief" of his lower back pain. (R. 424). His activities of daily living were "stable, but limited." Id. Plaintiff was following a diet and had lost fifteen to twenty (15-20) pounds. Id.

On August 5, 2011, Plaintiff reported to the Davis Memorial Hospital emergency room

complaining, in part, that his calf had been painful, swollen, and tender for several days. (R. 368). On August 28, 2012, Plaintiff was again seen for right foot pain that had lasted over a week, described as feeling like "a knife is sticking him in [the] foot," and alternately, "like a Charlie horse." (R. 408). The attending medical personnel noted that his right foot was swollen, especially below the joint of his big toe. Id. Plaintiff's uric acid levels were tested to rule out gout. (R. 412).

On his next followup with Dr. Anger on September 2, 2011, Plaintiff reported that his breathing was better after a bout with pneumonia. (R. 422). His gastroesophageal reflux (GERD) was controlled with medication. Plaintiff's chronic low back pain continued, but he now had neck pain and numbness in his arms and legs that was worse with sitting. Id. A pop can test was positive on the right side (though Dr. Anger did not specify whether pain, weakness, or both), with accompanying positive Phalen's test and Tinel's sign. Id. Dr. Anger also noted that Plaintiff continued to smoke, though he had tried to quit (including calling the quitline) in the past. Id.

On September 15, 2011, Plaintiff complained of numbness in his hand, stating that he had injured two fingers on his left hand and "did not feel it." (R. 421). At his November 3, 2011 followup, Dr. Anger noted that Plaintiff needed to lose weight and discussed exercise with him, also noting that Plaintiff had lost thirty pounds at that point (R. 419-20). Plaintiff also complained that his Buspar was not working, reporting that he coughs until he passes out. (R. 419). Low back pain, frequent urination, and anxiety continued; COPD was also assessed. Id. By April 19, 2012, Plaintiff reported being "very anxious [and] nervous," with "continuous anxiety," without panic attacks. (R. 416). Plaintiff had "shaking of the knees." (R. 417). His breathing was "worsening;" he had been smoking more recently due to his increased anxiety. Id. Plaintiff was started on Klonopin and Celexa for anxiety/depression. Id. At his next followup on June 7, 2012,

Plaintiff reported that Klonopin was helping with his anxiety. (R. 415). Dr. Anger noted paraspinal lumbar tenderness, bilateral, lateral to L1 and L2, without spasms. Id. On December 19, 2012, Plaintiff complained of difficulty breathing, pain and tightness in his chest with cough, swelling in his feet and legs that was worse with standing, and fatigue. (R. 413).

A transthoracic echocardiogram on January 17, 2013 revealed mild left ventricular hypertrophy, normal ejection fraction (60-65%), mild diastolic dysfunction, mild dilation of the left atrium (R. 441), and trace mitral regurgitation (R. 435). Plaintiff returned to Dr. Anger on February 27, 2013, complaining about his anxiety. (R. 491). Dr. Anger noted that Plaintiff exhibited a flat affect, though alert and oriented. (R. 492). Plaintiff was "off his Celexa" at that point, and wanted to increase his Klonopin dosage per his anxiety. (R. 491). However, Dr. Anger did "not want to [increase Plaintiff's] Klonopin at this time," and instead started Plaintiff on Wellbutrin. (R. 492). He noted Plaintiff's history of suicide attempts and discussed possible side effect of suicidal ideation with Plaintiff. Id. Dr. Anger also addressed counseling with Plaintiff. Plaintiff's "most recent counseling was in Morgantown," but Plaintiff did not want to attend counseling at that point, noting that "he has trouble being around people." (R. 491).

Plaintiff completed a six-minute walk test on April 19, 2013. The technician noted that Plaintiff had to stop walking after two minutes and rest for seven seconds due to cramping in his legs. (R. 479). However, Plaintiff's oxygen saturation did not drop low enough to warrant oxygen on exertion. Id. Imaging of Plaintiff's chest that same day revealed mild lung hyperinflation, but no acute findings. (R. 480). Plaintiff saw Dr. Anger for followup on May 20, 2013, where he continued to complain of trouble breathing (dyspnea), swelling in his legs and feet (lower extremity edema, and low back pain. (R. 489). Dr. Anger noted that Plaintiff "had tried [] stockings [for the swelling in his legs and feet], but th[ey] increase [the swelling]," and

he "has trouble laying flat." Id. A stress test was ordered, and completed on June 19, 2013, with normal results (R. 476). A spectral cardiac analysis done that same day was also normal. (R. 477). By July 10, 2013, Plaintiff was reporting that his nerves were "shot" and he could not sleep, as well as daily chest pain for the past six months. (R. 488). Dr. Anger observed venous stasis changes on Plaintiff's legs. Id.

On August 5, 2013, Plaintiff's breathing problems were evaluated by Ronald Mudry, M.D. pursuant to referral by Dr. Anger. (R. 466). Pulse oximetry (spirometry) revealed "minimal obstructive lung defect," a "decrease in flow rate at peak flow and flow at 25%, 50%, and 75% of the flow volume curve," FEF 25-75 changed by 12%, and lung volumes within normal limits. (R. 471).  Dr. Mudry noted that the "spirometry suggests restriction, [indecipherable], normal lung volume, [and] normal diffusion capacity." Id. Dr. Mudry diagnosed Chronic Obstructive Pulmonary Disease (COPD) and prescribed nocturnal oxygen for Plaintiff. (R. 472-73).

Plaintiff was seen by Dr. Anger again for follow-up on October 2, 2013, reporting trouble with his blood sugar. Dr. Anger diagnosed diabetes, and prescribed Metformin. (R. 484). On October 16, 2013, Dr. Anger noted that Plaintiff's anxiety had increased despite him being "compliant with medications" (R. 583):

> Feels like nerves are shot. We were trying to limit his temazepam, however, he states once daily [i]s not cutting it. He feels like he is about [to snap]. He refuses to get Appalachian Mental Health. He states he has been to West Virginia University in past but cannot go there all the time.

(R. 584). On November 27, 2013, Dr. Anger informed Plaintiff that he "needs to get better control of his diabetes," and provided him with "some handouts on diet control." (R. 577). At that visit, Plaintiff's lower extremity swelling was "under decent control," but was still having shortness of breath on exertion. (R. 580). Plaintiff advised that he had not gotten labs done because he lost the paperwork for them, but would get them taken care of. (R. 581).

On January 27, 2014, Plaintiff was seen for follow-up with Jenny Cross, M.D., after a sleep study (polysomnography) on December 5, 2013. (R. 529). Plaintiff complained that he is "tired all of the time and has daytime sleepiness every day." Id. Plaintiff scored 13 out of 24 on the Epworth Sleepiness Scale, and a 10 on the self-report Asthma Control Test. Id. Dr. Cross diagnosed obstructive sleep apnea (severe) based on Plaintiff's polysomnography results, and prescribed a PAP mask. (R. 530). Dr. Cross also assessed hypersomnolence, nocturnal hypoxia, fatigue, asthma, morbid obesity (with a BMI of 46.17), and snoring. Id. Dr. Cross also noted that "narcotic pain medication [which Plaintiff takes] increases the severity of untreated [obstructive sleep apnea] and contributes to respiratory control instability." (R. 537).

On March 26, 2014, Plaintiff had gotten his blood sugar (typically in the 100s) and hemoglobin levels down; "recent liver function tests [we]re still elevated but improved." Id. Plaintiff was watching his diet and had lost a few pounds. (R. 568). He reported occasionally drinking alcohol, but Dr. Anger advised him that he could not drink any more with the medications he was on. Id. Plaintiff's anxiety issues continued. Id. An ultrasound on April 1, 2014 revealed "mild increased echogenicity of the liver which may represent fatty infiltration;" otherwise, results were unremarkable and there was no evidence of cholelithiasis (R. 543). A left knee imaging study on September 3, 2014 showed "mild early osteoarthritis without definite acute fracture of malalignment." (R. 541). Lab results reviewed with Dr. Anger on October 22, 2014 showed that Plaintiff's cholesterol and hemoglobin levels had improved, though x-rays showed arthritis. (R. 559). On November 19, 2014, Plaintiff received an injection in his left knee (R. 549-551).

On June 2, 2015 Plaintiff complained of heaviness in his left arm, right ear discomfort, and "occasional sharp chest pain." (R. 598). His anxiety had been elevated. Id. Plaintiff reported

that his pain was controlled "fairly well," though "some days [we]re better than others," and pain continued in his knees, back, shoulders, and all joints. Id. On July 14, 2015, Plaintiff continued to have back pain; Dr. Anger told him to "decrease activity" and continue pain medication to "help take the edge off," which Plaintiff said provided "moderate control." (R. 593). Plaintiff reported that Benicar was ineffective at controlling his blood pressure and had stopped taking it, asking to be switched to something else. Id. On September 14, 2015, Plaintiff reported he was "doing okay," and medications helped "somewhat." (R. 587). He was taking chronic pain medications for joint discomfort, his blood pressure was elevated, and he was experiencing "mood swings which range[d] from anger to sadness." Id. Plaintiff had eliminated soda and was drinking more water; was exercising more and had lost weight, but continued to smoke. Id.

## 1.  Medical Reports/Opinions

### a.  *WV DHHR MRT Physical Form Completed by Treating Physician*

On January 19, 2011, Dr. Anger completed a Physical Examination for the West Virginia Department of Health and Human Resources' (DHHR) Medical Review Team (MRT) pursuant to Plaintiff's evaluation for adult Medicaid. (R. 450). Dr. Anger observed obesity, varicose veins and edema (swelling) in Plaintiff's legs; arteriosclerosis; bilateral pain in Plaintiff's lumbar area, and a flat affect and depressed mood. (R. 451). Dr. Anger diagnosed major depression and anxiety, and low back pain. Id. Dr. Anger opined that Plaintiff should avoid stressful work situations, and would be unable to work full time for at least one year "due to psychiatric and physical limitations." (R. 451-52).

### b.  *Consultative Examination – Internal Medicine*

On December 19, 2013, Dr. Stephen Nutter completed a consultative examination of

Plaintiff and reviewed medical records. (R. 512). Dr. Nutter's impressions included COPD, asthma, chronic cervical and lumbar strain, degenerative arthritis, and chest pain. (R. 516). A Ventilatory Function Form also dated December 19, 2013 and signed by Angie Henshaw (credentials unspecified) indicated "moderate restrictive pulmonary disease without improvement after bronchodilator." (R. 521).

### c. *Consultative Examination - Mental Assessment*

On January 14, 2014, Licensed Psychologist Morgan Morgan, M.A. completed a consultative examination and mental assessment consisting of a mental status examination and clinical interview. (R. 523). Plaintiff's sister drove him to the appointment. Id. Morgan observed that Plaintiff was "rather sullen," but cooperative; his clothing appeared "somewhat soiled," and his grooming was "minimal." Id. Plaintiff reported that "he was admitted to Chestnut Ridge Hospital for approximately two weeks for depression and [suicide attempt by] overdose." (R. 524). He subsequently continued to receive psychiatric services at Chestnut Ridge on an outpatient basis in 2010. Id. Morgan noted that "these services may have lasted for a period of time." Id.

Plaintiff reported a history of "recurrent depressive episodes" dating back to the 1980s, as well as PTSD beginning in 2006:

> His current mood is described as depressed. He reported guilt feelings. He frustrates easily and displays irritability. His libido is diminished and he reported symptoms of anhedonia. The client reported being socially withdrawn and avoidant. He often ruminates over problems making it difficult to maintain attention and concentration. He is forgetful. The client reported a history of academic difficulties. The client stated that he has occasionally heard an unspecified individual "call his name," although no one is in the home. He reported one time in the remote past, seeing a Confederate soldier pass through the ceiling onto the floor and then later disappear. He denied any current psychosis. The client reported that he has difficulty falling asleep due to ruminations over stressors. He has difficulty breathing, which causes awakenings in the night. He also reported being awakened by nightmares. He does not feel rested. The client's appetite is diminished. He denied significant weight fluctuations. The client reported infrequent

crying spells, and often attempting to blunt his emotions. His energy level was reported to be low. He reported a past suicide attempt by overdose of drugs in 2009.

He also apparently had tried to asphyxiate himself in his 20s. The client indicated that he had once attempted to shoot himself, although the gun misfired. The client denied any current plan of suicide. He reported no history of homicidal ideations. The client reported that he came home to discover his wife had shot herself in the head, and since that time, he has been suffering nightmares and intrusive memories. He reported hypervigilance, avoidance to stimuli that remind him of this past issue, as well as triggers that remind him of these symptoms. He reported that these symptomatologies occur on a daily basis.

(R. 523-24). Plaintiff also reported a history of difficulty with others, including "a history of significant disciplinary problems" at school and being suspended "often" because of fighting; being fired from Coastal Lumber Company "after an issue arose and he threatened his employer;" a history of "problematic" relationships with coworkers and supervisors; and a history of troubled relationships with both of his ex-wives. (R. 525).

As to the Mental Status Examination, Morgan wrote:

The client arrived wearing worn and somewhat soiled clothing, displaying minimal hygiene and grooming. He exhibited significant body odor. He is reported to be 6 feet 1 inch tall, and weighs 350 pounds. He was cooperative during the assessment, although thoroughly disgruntled at being here. His eye contact was adequate as the assessment progressed. His level of spontaneity was adequate. The length and depth of his verbal responses were within normal limits. His demeanor depicted a history of extroversion, although he was clearly tense and uncomfortable today. The client's speech was both relevant and coherent, but at a mildly slowed pace. He was oriented to time, name, place, and date. The client's mood was dysphoric and irritable, as well as anxious. He displayed a restricted affect. The client did not display signs or symptoms of psychosis. His statements of past socialization and presentation strongly suggest maladaptive personality features. His insights were deemed to be moderately deficient, based upon his statements and presentation. The client's judgments were deemed to be within normal limits, based upon his statements. He did not display signs or symptoms of suicidal or homicidal ideation. His immediate recall was observed to be within normal limits, as he was capable of immediate recall of four words. The client's recent recall was observed to be severely deficient, as he was later capable of producing one of the four words after a 15-minute delay. The client's remote recall was observed to be moderately deficient, based upon his ability to produce historic and personal facts. The client's concentration was observed to be mildly deficient, based upon a scaled score of 7 on the Digit Span subtest of the WAIS-IV. He displayed slow personal tempo.

(R. 524-25). Morgan described Plaintiff's demeanor as sullen and disgruntled; his mood as dysphoric, irritable, and anxious; his affect as restricted; and his tempo as slow. (R. 526). Plaintiff's "presentation and statements depicted a history of maladaptive personality features." Id. Immediate memory was within normal limits, recent recall was severely deficient, and remote recall was moderately deficient. Id. Concentration was mildly deficient. Id. Below average intelligence was suggested. Id.

Plaintiff reported limited daily activities, consisting of simple food preparation "occasionally," infrequent trips to the laundromat, grocery shopping once a week, and a "few" household chores, which he can do for about two minutes before needing to rest for half an hour. (R. 527). Plaintiff reported a "limited social network" (including a cousin, his ex-brother-in-law, and sister). Id. Plaintiff attended no social activities, did not speak on the telephone, and was not dating. Id. His interactions were limited to visits from his ex-brother-in-law and cousin "a couple times monthly." Id.

Morgan assessed Plaintiff's social functioning as "severely deficient." (R. 527). His diagnostic impressions included 1) "Major Depressive Disorder, recurrent, severe, without psychotic features, without full interepisode recovery; 2) Posttraumatic Stress Disorder, and 3) Alcohol Use Disorder, moderate. (R. 526). Concentration was mildly deficient; persistence, pace, and recent memory were severely deficient; immediate memory was within normal limits. (R. 527). Insight was moderately deficient; judgment was within normal limits. (R. 525). Morgan noted that Plaintiff would "not be able to appropriately manage his own finances due to his history of alcohol consumption." Id. Morgan opined that Plaintiff's prognosis was "poor." (R. 526).

### d.    *Disability Determination at the Initial Level*

On January 2, 2014, SDM Steven Snow reviewed Plaintiff's records and completed a physical residual functional capacity ("PRFC") assessment. (R. 94-95). Snow found the following exertional limitations: Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand, walk, and/or sit for about six (6) hours in an eight (8) hour workday; and unlimited pushing and/or pulling. (R. 94). As to postural limitations, Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl. (R. 94). No manipulative, visual, or communicative limitations were found. Id. As to environmental limitations, Plaintiff could have unlimited exposure to wetness, humidity, noise, and vibration, but was to avoid concentrated exposure to hazards, extreme cold and extreme heat; and avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilations, etc. (R. 95).

On January 20, 2014, agency reviewer Joseph Shaver, Ed.D. completed a psychiatric review technique ("PRT") and mental residual functional capacity ("MRFC") assessment. (R. 95-97). As to the B Criteria, Shaver found mild restriction of activities of daily living, moderate difficulties in maintaining social function, and moderate difficulties in maintaining concentration, persistence or pace. (R. 92). As to understanding and memory limitations, Shaver found moderate limitations in Plaintiff's ability to understand and remember detailed instructions. (R. 96). As to sustained concentration and persistence limitations, Plaintiff was moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (R. 96). Plaintiff also had moderate limitations in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform as a consistent pace without an unreasonable number and length of rest periods. Id. As to social interaction limitations, Plaintiff was

moderately limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors. (R. 96-97). As to adaption limitations, Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting. (R. 97). In the remaining areas, Shaver found no significant limitations.

Shaver's explanation was as follows:

MSE (1I15/ 14) rated recent memory, pace and persistence as severely impaired while concentration was only mildly deficient. Although Clmt's social functioning was also reported to be severely impaired, he was cooperative during the evaluation process and maintained good eye contact. His level of spontaneity was adequate. Clmt is reported to have a network of people with whom he interacts. With regards to ADLs, Clmt fixes easy foods, grocery shops and handles personal finances. It is believed that Clmt retains the mental capacity to operate in work-like situations that do not require high levels of concentration, large amounts of social interaction or strict production quotas.

(R. 97).

### e.  *Disability Determination at the Reconsideration Level*

On April 8, 2014, agency reviewer A. Rafael Gomez, M.D. reviewed the prior PRFC Assessment and affirmed Snow's initial PRFC as written. (R. 143). Dr. Gomez then made an additional notation labeled "RFC – Additional Explanation" that stated "Patient has morbid obesity level III, back pain. Was reduced to light RFC prior to DLI." (R. 145).

On April 3, 2014, agency reviewer Jim Capage, Ph.D. completed a second PRT for the time period from May 3, 2011 to June 30, 2012, and found insufficient evidence to rate the B and C criteria of the listings. (R. 139). On the same day, Capage completed a third PRT for the current evaluation period, evaluating Plaintiff under listings 12.04, 12.06, and 12.09. As to the B Criteria, Capage found mild restriction of activities of daily living, moderate difficulties in maintaining social function, and moderate difficulties in maintaining concentration, persistence or pace. (R. 140).

As to understanding and memory limitations, Capage found moderate limitations in Plaintiff's ability to understand and remember detailed instructions. (R. 145). As to sustained concentration and persistence limitations, Plaintiff was moderately limited in his ability to carry out detailed instructions, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (R. 146). Plaintiff also had moderate limitations in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform as a consistent pace without an unreasonable number and length of rest periods. Id. As to social interaction limitations, Plaintiff was moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. 146). As to adaption limitations, Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting. (R. 147). All other areas were not significantly limited or contained no evidence of limitation. Id. Capage's explanation was as follows:

> "MRFC assessment indicates that the cl[aimant] can learn and perform at least routine 2-3 step work-related activities in a setting that keeps change to a minimum. Tasks should be low stress with no fast-paced production quotas, no complex decision making, and no supervisory responsibilities. He is best suited to work on his own in a setting that calls for no more than occasional and superficial social interaction.

(R. 147).

## C. Testimonial Evidence

At the ALJ hearing held on November 17, 2015, Plaintiff testified that he was widowed, and has two adult children in their thirties who do not reside with him. (R. 43-44). Plaintiff testified that he had lived alone for "probably over a year" in a "leaky camper" belonging to a

friend. (R. 44). The camper has two steps that Plaintiff had to use "maybe five or six times" per day to use the restroom outdoors. (R. 45).

Plaintiff testified that he had obtained his GED, and had no other on-the-job training or education. (R. 51). Plaintiff had no income; he testified that he received food stamps and a medical card monthly. Id. Plaintiff had previously worked at a sawmill; he left that job to work at Walmart because it "paid a little more money [and] was easier." (R. 54). Plaintiff last worked at Walmart where he started out in maintenance and eventually began stocking shelves. (R. 53). Plaintiff left that job because his wife committed suicide. Id. He did not recall whether he had looked for work after that. Id. Plaintiff alleged disability beginning October 14, 2008, when he attempted suicide (R. 52).

At the hearing, Plaintiff testified as to his physical and mental conditions. When his attorney asked him to start with the condition he felt most interfered with his ability to work, Plaintiff responded:

> A     My whole body feels like it's asleep. My brain feels like it's -- I don't know how it feel.
> Q     Say again?
> A     I [sic] mental state -- I can't stand to be around people. Every joint and my body hurts. My legs -- I can't hardly walk. To walk from here to you, I would be out of breath [I'd] have to lean up against a wall or something.

(R. 54). In 2003, Plaintiff's hand was "crushed," requiring surgery and physical therapy after his finger had to be amputated. (R. 55). Plaintiff was taking Seroquel, Buspar, Benicar, Metoprolol, Symbicort, and "a bunch of others" whose names he could not recall. (R. 55). He was not aware of any side effects or problems from his medications. Id. Plaintiff's attorney questioned him regarding his alcohol consumption. Plaintiff had a DUI "at least 15 years ago." (R 57). Presently, "it [had] been a few a months" since he had consumed any alcohol, the last occasion involving drinking "half a beer" when a friend stopped by his camper. (R. 56).

Plaintiff also testified regarding his daily activities. Plaintiff goes out "once a week" to attend doctor's appointments and get food, but his activities were limited to that because he could not "stand to be around people." (R. 46). Plaintiff's license was suspended "probably 20 years ago" after he got a speeding ticket. Id. Plaintiff estimated that he had not driven in at least "six months or so," though it had likely been "a lot longer." (R. 46-47). When Plaintiff needs to go somewhere, he has to call his cousin Ronald or his ex-brother-in-law Victor to get a ride. (R. 48).

The camper "ha[s] no water in [it]," so Plaintiff cannot shower or do laundry at home. (R. 57). Rather, he had his "first shower . . . in probably over a month" the night before the hearing at his cousin's house. Id. He used to take his laundry to the Laundromat to wash, but no longer has a way to do that since he "quit driving [his] truck" "months ago." (R. 58). Plaintiff makes himself a sandwich once or twice a day, because that does not take much preparation and he does not have to wash any dishes. (R. 57).

Plaintiff's attorney asked him how he was feeling at the hearing. Plaintiff responded that he was feeling "frustrated, aggravated, nervous, nauseous" and "pissed off." (R. 58). He testified that he was upset by "being around people" and "not being able to do nothing" [sic]. Id. Plaintiff dislikes authority figures, stating he "might tell them to kiss my ass" if told to do something or criticized. (R. 59). Plaintiff testified that he is easily aggravated and frustrated when things do not work the way they should. Id. He also gets "sad" daily, and experiences frequent crying spells. Id. Plaintiff explained "I think what it is is when I came home, found my wife laying in the bed where she blowed [sic] her brains out, I can't get that image out of my brain, and it's like watching TV. I look over at the wall, I can see her laying there on the bed with the – just – I just

– can't take it." Id. "It's hard to do anything whenever [inaudible] all you can see is your dead wife laying there on the bed." Id.

Plaintiff noted that the only real social interaction he usually has is that his cousin will check on him "probably twice [a] week for about maybe half [an] hour each visit." (R. 60). Plaintiff explained that when his cousin visits him, "part of [him] feels to have some company, and part of [him] feels wish to hell he [would] get out of there and leave me the hell alone." Id. Plaintiff does not adapt to change very well. Id.

Plaintiff testified that he cannot stand up for very long, because he gets "lightheaded and dizzy." (R. 61). He also gets short of breath with activity, estimating that he could sweep a floor for "a couple minutes" before he would have to stop. Id. He also will sometimes become short of breath when he is just sitting. Id. When he is short of breath, he has an inhaler he uses, and also tries "sit[ing] down, lean[ing] up against a wall, [or] try to find something to hold onto." (R. 62). Plaintiff has been told to stop smoking by his doctors, so he smokes less now than he used to, but has not been successful at quitting entirely. Plaintiff "wishe[s he] could quit, but it just ain't easy; [his] nerves are shot . . . [he] get[s] aggravated and fee[s] like ripping [his] head off or somebody else's head off[, and s]moking a cigarette helps calm [him]." (R. 62).

Plaintiff also testified with regard to edema and swelling in his legs that his legs "hurt like hell," they "stay swoled [sic] up," and they also fall asleep. (R. 62). Plaintiff testified that as a result of these problems with his legs, he cannot stand up for more than ten (10) minutes at a time. Id.

### D.     Vocational Evidence

Also testifying at the hearing was Casey Vass, a vocational expert.  Mr. Vass characterized Plaintiff's past work at the sawmill as a "lumber stocker," DOT code 922.687-070,

which was heavy, semiskilled work with a specific vocational preparation (SVP) of 2. (R. 64).

Plaintiff's past work at Walmart doing maintenance was characterized as a "janitor," DOT code

381.687-018, which was medium, unskilled work with an SVP of 2. Id. With regards to

Plaintiff's ability to return to his prior work, Mr. Vass gave the following responses to the ALJ's

hypothetical:

> Q: Mr. Vass, assume a hypothetical individual the same age, education, and work experience as the claimant, who retains the capacity to perform light work with allow us to alternate sitting and standing positions for up to two minutes at 30 minute intervals without going off task; who is limited to know for control operation bilaterally; occasional posturals except no climbing of ladders, ropes, or scaffolds; is limited -- whose right, upper extremity is limited to frequent handling and fingering, wouldn't require the use of the fifth digit or the pinky finger on the dominant hand; must avoid concentrated exposure to extreme cold and heat, concentrated exposure to witness and humidity, concentrated exposure to excessive vibration, all exposure to irritants and chemicals, all exposure to unprotected heights, hazardous machinery, and commercial driving; whose work is limited to simple, routine, and repetitive tasks requiring only simple decisions with no fast pace production requirements and few workplace changes; who is to have no interaction with the public and only occasional interaction with coworkers and supervisors.
> It is my understanding such an individual would be incapable of performing the past work of the claimant, is that correct?
>
> A: I agree.

(R. 65). Incorporating the above hypothetical, the ALJ then questioned Mr. Vass regarding

Plaintiff's ability to perform other work:

> Q   Are there other jobs in the national economy that such an individual could perform?
>
> A   I would list the first job as a kitchen worker. Code is 316.684-014, 402,000 jobs in the nation. Assembler. Code is 729.684-046, 180,000 jobs in the nation. A mail clerk. Code is 209.687-026, 120,000 jobs in the nation. These jobs are light with an SVP of 2, unskilled.
>
> Q   Regarding tolerances, what are the customary tolerances a typical employer would have us to an employee being [late] to work or having unexcused or unscheduled absences, and if that were exceeded, what would the result be?
>
> A   Frequency would be a day and a half a month. They would be terminated if it exceeded that.
>
> Q   What are the customary number and length of breaks that a typical employer permits during the workday?

| A | Usually morning, afternoon, 15 minutes, 30 minutes for lunch. |
|---|---|
| Q | What are the customary tolerances for how much time during an eight-hour workday a typical employer would permit an employee to be off task in addition to regularly scheduled breaks, and if that were exceeded, what with the result be? |
| A | Ten percent at the workstation. Termination if exceeded. |
| Q | Has all your testimony today been consistent with and according to your experience at the DOT? |
| A | Yes, your honor. |
| Q | And if there's any deviation between your testimony at the DOT, for example, sit/stand option or the fingering, would those deviations based on your experience? |
| A | Yes, sir. |

(R. 65-66). Plaintiff's attorney questioned Mr. Vass when provided the chance:

| Q | Mr. Vass, sit/stand option, if a person was asked to do light work but can only stand for five minutes and then sit down for 10 minutes, how would that affect the ability to perform the light work? |
|---|---|
| A | I think the question would be whether they remain on task or off task. |
| Q | Let's assume that when you're sitting down, you're off task. |
| A | It eliminates it. |
| Q | And if a person was had a habit of having weekly insubordination at least once a week |
| A | Not doing what the boss tells them to do? |
| Q | How is that going to affect employment? |
| A | Terminated after 30 days of that. |
| Q | And if a person was limited to no interaction with coworkers or supervisors, how would that affect employment? |
| A | No jobs. |
| Q | Okay. All right, Mr. Vass, thank you very much. |

(R. 67).

## E.      Report of Contact Forms or Disability Reports

Plaintiff's sister, Sandra Wratchford, helped him complete a Disability Report form dated

November 4, 2013. (R. 300). Plaintiff was currently taking Albuterol, Buspar, Spiriva, and

Symbicort for "breathing;" Fenofibrate, Klonopin, and Seroquel for depression; Oxycodone for

back pain; Prevastatin and Tricor for cholesterol; Lasix for "fluid;" Metformin for diabetes;

Omeprazole for "stomach;" Toprol for blood pressure; and Potassium for unspecified reasons.

(R. 304). Plaintiff advised that his "COPD and breathing problems limit [him] from doing almost

everything;" the "lack of oxygen makes [him] dizzy if [he] walk[s] very far," and he sometimes

coughs, "totally pass[es] out and fall[s] over." (R. 317). As to his PTSD, Plaintiff elaborated:

> My PTSD has left me so debilited [sic] I am not really able to do anything that I have to
> do any thinking about. I have bad panic attacks if I around [sic] people and feel like I
> can't breath [sic] when I have to go shopping most of the time I just go to the little stores
> in Mill Creek so there won't be many people. If I have to go to Wal-Mart I go late at
> night when hardly no people are there. I have a very short temper and can hardly tolerate
> talking to anyone.

(R. 317). A second Disability Report (Appeal) form was submitted online by Plaintiff's counsel

on April 23, 2014, and contained – substantively – a list of Plaintiff's medications and his

primary care physician. (R. 334).

**F.       Lifestyle Evidence**

On an Adult Function Report dated November 4, 2013, Plaintiff stated that:

> My PTSD does not allow me to be around a lot of people, I can hardly breath [sic] and I
> can not walk more than a few feet without get [sic] dizzy spells. I don't have any energy,
> now with my diabetes I feel bad because its to [sic] high or to [sic] low, my back and legs
> hurt really bad if I stand or walk for more than a few seconds.

(R. 318). At that time, he reported living in a house with a friend. Id. As to daily activities,

Plaintiff reported sitting on the couch, watching television, and sleeping. Id. "Most of the time

[he would not] even answer [his] phone because [he is] in so much pain or so depressed, [he]

can't deal with company." (R. 319). He did not care for any other people or pets. Id. Before his

illnesses and conditions, Plaintiff was "able to work, do yard work. [and] have a life." Id. Now,

he has to sleep with oxygen; even then, he doesn't sleep much due to frequent urination from his

diabetes, and an inability to "get comfortable from the pain in [his] back and legs." Id.

Plaintiff keeps his hair short so it does not require any grooming; he shaves "maybe once a month because [he] get[s] dizzy when [he] stand[s] up for very long." Id. Likewise, standing in the shower makes him dizzy and he has to lean on the wall to keep from falling. Id. Plaintiff reports that getting dressed "drains [his] strength and energy." Id. Plaintiff used to cook, but can no longer stand up long enough to do so; Plaintiff reports having to "hold on to a chair just to pour a cup of coffee." (R. 320). Now, he prepares and eats only sandwiches, once or twice a day. Id. His inability to exercise or stand long enough to cook healthy meals has left him "morbidly obese" as a result. (R. 319). Plaintiff's sister calls to remind him of doctor's appointments; Plaintiff forgets them if she does not. (R. 320). Plaintiff cannot clean or do yard work, "because [he does not] have the breath or the energy, and the pain level is too severe." Id.

Plaintiff reported going outside "maybe a couple times a week" to sit on his porch for a few minutes. (R. 321). He also shopped once a week for groceries for about ten to fifteen (10-15) minutes. Id. Plaintiff reported that he has no money, but if he did, he would be capable of paying bills and handling money. Id. As to hobbies and interests, Plaintiff "use[d] to love to read," but cannot concentrate or stay focused long enough to do that now. (R. 322). Instead, he watches a lot of television. Id. Plaintiff reported that he does not spend time around other people; if someone comes to visit – which happens "maybe once a week" - he watches television. Id. Plaintiff does not go places for any social activities; if he was able to get out, he would "probably need help." Id. He checked "no" to problems getting along with family, friends, neighbors, or

others. (R. 323). However, Plaintiff also noted that he does not "like being around people because [he is] not good company," and he dislikes being around people or talking to them. <u>Id.</u> Plaintiff reported that he "use[d] to visit and go to parties a lot when [he] was able." <u>Id.</u>

Plaintiff reports that his conditions affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, remember things, complete tasks, concentrate, follow instructions, and get along with others. (R. 323). He reported being able to lift "maybe 5 or 10" pounds. <u>Id.</u> He gets dizzy and light headed when he squats, bends, stands, reaches, walks, or kneels. <u>Id.</u> He can talk, but "just do[es]n't like to talk to people." <u>Id.</u> His legs give out if he climbs "more than a couple stairs." <u>Id.</u> Plaintiff also reported that his "mind w[a]nders." <u>Id.</u> Plaintiff is right handed. <u>Id.</u> He reported being able to walk "maybe 20 feet" before needing to stop and rest; he would have to rest "a couple of min[utes]" before he could resume walking. <u>Id.</u> Plaintiff did not know how long he could pay attention, followed written instructions "ok[ay he] guess[ed]," and did not follow spoken instructions well because he does not like "being told what to do." <u>Id.</u> Plaintiff reported that he does not get along with authority figures very well, elaborating that he was kicked out of all of his classes in school "at one time or the other." (R. 324).

Plaintiff reported that he does not handle stress very well; he does not like to be around other people, as his "nerves can't handle the stress." (R. 324). As to changes in his routine, Plaintiff advised that "[his] only routine is sitting on the couch watching tv." <u>Id.</u> Plaintiff also

reported that he is "paranoid," and "think[s] someone is watching [him] all the time." Id. Plaintiff

uses a cane almost every day around the house. Id.

## IV.   THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-

step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work,

we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V. ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.

2. It was previously found that the claimant is the unmarried widower of the deceased insured worker and has attained the age of 50. The claimant met the non-disability requirements for disabled widower's benefits set forth in section 202(f) of the Social Security Act.

3. The prescribed period ended on October 31, 2015.

4. The claimant has not engaged in substantial gainful activity since May 2, 2011 (20 CFR 404.1571 et seq., and 416.971 et seq.).

5. The claimant has the following severe impairments: osteoarthritis, status post amputation 5th digit right hand; chronic obstructive pulmonary disease ("COPD"); obstructive sleep apnea; obesity; asthma; chronic cervical and lumbar sprains; diabetes mellitus; anxiety; depression; and post-traumatic stress disorder ("PTSD") (20 CFR 404.1520(c) and 416.920(c)).

6. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

7. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the type of work must: provide a sit/stand option, allowing the person to change between sitting and standing for up to 2 minutes at 30 minute intervals without breaking task; entail no bilateral foot control operation; entail no more than frequent bilateral handling and fingering and no use of the 5th right digit; entail no climbing ladders/ropes/scaffolds and only occasional other postural movements (i.e. climbing ramps or stairs, balancing, stooping, kneeling,

crouching, or crawling); entail uo concentrated exposure to extreme hot and cold temperatures, wetness and humidity, and vibration; entail no exposure to respiratory irritants (such as fumes, odors, dusts, gasses, and poor ventilation), chemicals, or hazards (i.e. unprotected heights, dangerous machinery, and commercial driving); be limited to simple, routine, and repetitive tasks, requiring only simple decisions, no fast-paced production requirement, and few work place changes, and entail no more than occasional interaction with supervisors and co-workers and no interaction with the public.

8.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

9.      The claimant was born on May 19, 1963, and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

10.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

11.     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

12.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1559 and 404.1569(a)).

13.     The claimant has not been under a disability, as defined in the Social Security Act, from May 2, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 22-32).

# VI.    <u>DISCUSSION</u>

## A.     Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a

conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law. "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

However, there are a number of things that an ALJ generally must do in weighing the evidence. An ALJ has a basic duty of explanation; his decision must be sufficiently explained to permit a court to meaningfully review it. Radford v. Colvin, 734 F.3d 288, *295-95 (4th Cir. 2013). Further, there must be an "accurate and logical bridge" from the evidence to the ALJ's conclusion. Monroe v. Colvin, 826 F.3d 176, *189 (4th Cir. 2016). An ALJ must "explicitly indicate[] the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, *235-36 (4th Cir. 1984). There are also some things an ALJ may *not* do in reaching a decision. An ALJ may not selectively "cherrypick facts that support [his decision] while ignoring relevant evidence [to the contrary]." Lewis v. Berryhill, 858 F.3d 858, *869 (4th Cir. 2017). Thus, while

an ALJ is not required to discuss *every* piece of evidence, <u>Reid v. Commissioner</u>, 769 F.3d 861, *865 (4th Cir. 2014), an ALJ excludes *relevant* evidence at his peril.

**B.     Contentions of the Parties**

Plaintiff, in his Motion for Summary Judgment, asserts that the Commissioner's decision is based upon an error of law (ECF No. 11 at 11-12) and "is not supported by substantial evidence." (Pl.'s Mot., ECF No. 10 at 1).  Plaintiff alleges that the ALJ erred by:

1.     "Rely[ing] on the 'reviewing examiners' over the findings of treating and 'consulting' examiners" contrary to 20 C.F.R. § 416.927(c)(1) (ECF No. 11 at 4);

2.     Affording improper weight to medical opinions of state agency reviewers who "merely signed off" on the assessments (<u>Id.</u> at 5);

3.     Improperly crediting "medical opinions of the Single Decision Maker and the Reviewing Doctor [that] were based on an incomplete record" (<u>Id.</u> at 6);

4.     Disparately "discount[ing] the consultative examiner's findings because he did not have any 'treatment notes,'" while crediting the reviewing examiners who also did not have treatment notes (<u>Id.</u> at 6);

5.     Finding that Plaintiff had not had "significant mental health treatment" when the record showed he was treated by Dr. Anger for PTSD, depression, and anxiety (<u>Id.</u> at 8);

6.     Giving inconsistent weight to consultative examiners in the five-step analysis (<u>Id.</u> at 8-9);

7.     Improperly minimizing the severity of Plaintiff's limitations by making arbitrary distinctions between "severe" and "marked" (<u>Id.</u> at 10);

8.     Improperly "averaging out" Plaintiff's limitations in Step 3 of the analysis (<u>Id.</u> at 11);

9.     Improperly substituting his own lay opinion for that of trained medical personnel in determining that Plaintiff's COPD was not as severe as the evidence indicated (<u>Id.</u> at 12-13);

10.    Formulating an RFC that is inconsistent with the medical evidence without sufficient explanation for the deviation (<u>Id.</u> at 14-15).

In addition, although Plaintiff applied for benefits alleging an onset date of October 14, 2008, the ALJ noted that the time period of October 14, 2008 through May 2, 2011 had already been adjudicated by an ALJ in a prior unsuccessful application. (R. 19). Because ALJ La Lack found no basis for reopening or revising that prior determination, his consideration included from May 2, 2011 to the date of his decision. <u>Id.</u> However, Plaintiff argues that the Commissioner "de-facto reopened [Plaintiff's] prior claim by utilizing evidence from 2009" when she "asked her consultative examiner to review evidence" from Plaintiff's prior adjudicated claim. (ECF No. 11 at 7). Plaintiff accordingly asks the Court to "remand his claim for further proceedings." (<u>Id.</u> at 15).

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at [#]). Specifically, Defendant alleges that the ALJ's is supported by substantial evidence because the ALJ's formulation of Plaintiff's Physical and Mental RFCs (Residual Functional Capacity) and his evaluation of Plaintiff's social functioning, concentration, persistence, or pace were all permissible. (Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br."), ECF No. 13). The Commissioner argues that affording weight to a medical opinion whose author considered less

than the full record is not error unless there is additional medical evidence that may change the medical consultant's finding; and because Dr. Morgan was not a treating source, his opinion was not entitled to controlling weight. Id. The Commissioner also argues that Plaintiff's argument regarding reopening is conclusory, and therefore waived; even if that were not so, mere consideration of prior medical evidence does not equate to reopening. Id.

In his response, Plaintiff reiterates that the ALJ's reliance on agency reviewers is not supported by substantial evidence (ECF No. 14 at 1-3); that the ALJ improperly credited agency reviewers over the consultative examiner (Id. at 3-5); that the weight assigned to Consultative Examiner Morgan is "not rational," (Id. at 6); and that the ALJ impermissibly disregarded objective medical evidence in favor of his own lay interpretation of same, which led him to inadequately account for COPD in the formulated limitations. (Id. at 7).

## C. Analysis of the Administrative Law Judge's Decision

The undersigned finds that the ALJ's decision is legally insufficient and not supported by substantial evidence for a number of reasons. First, the ALJ erred by failing to explicitly indicate what weight was assigned to two of the four sources of medical and opinion evidence in the record (a treating physician and a consultative examiner) in the first instance. Second, the ALJ erred by failing to conduct a sufficient analysis of weight as directed by the regulations. Third, the ALJ drew conclusions about the evidence and made findings of fact that are not supported by substantial evidence, or in some cases, are simply incorrect. Because the ALJ's erroneous and unsupported conclusions and flawed analyses were then used almost entirely as the basis for his credibility determinations and assignment of weight, the ALJ's ultimate decision cannot be – and is not - supported by substantial evidence. The undersigned accordingly recommends that the matter be remanded to the Commissioner for reconsideration.

1. **The ALJ failed to follow the directives of the Commissioner's Regulations in assigning weight to medical opinions.**

The regulations, specifically 20 C.F.R. § 404.1527(c), discuss how medical opinions are weighed:

*How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion:

> (1) *Examining relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

> (2) *Treatment relationship*. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> > (i) *Length of the treatment relationship and the frequency of examination*. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more

weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization.* We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors.* When we consider how much weight to give a

medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

20 C.F.R. § 404.1527(c).

Here, the ALJ assigned "substantial weight" to a residual functional capacity from a *prior* decision. (R. 26). The ALJ assigned "great weight" to agency reviewer Gomez, who prepared the physical RFC. (R. 30). The ALJ assigned "substantial weight" to agency reviewers Shaver and Capage, who prepared and affirmed the PRTs and mental RFCs. Id. Nowhere in the ALJ's decision, however, was it specified how much weight was assigned to treating source Dr. Anger, or to Consultative Examiner Morgan.

   a. **The ALJ failed to assign a weight to two out of four medical sources – a treating physician, and a consultative examiner – in violation of 20 C.F.R. § 1527.**

In order to evaluate Plaintiff's complaint that the ALJ gave arbitrarily disparate treatment in assigning weight to sources of medical evidence, a reviewing court must first know how much weight was assigned to each. Indeed, a reviewing court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). Finding substantial evidentiary support when the ALJ has failed to do so "approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977) (quoting Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974)).

### i. Treating Physician Dr. Anger

> *Medical opinions.* Medical opinions are statements from acceptable medical sources
> that reflect judgments about the nature and severity of your impairment(s), including your
> symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and
> your physical or mental restrictions.

20 C.F.R. § 404.1527(a)(1). While the record does not contain a standard Medical Source

Statement Form that is usually completed by a plaintiff's treating physician for SSA, the record

does contain *an* opinion from Dr. Anger for the DHHR, based on an in-person examination of

Plaintiff to inform a state agency determination of disability ("MRT [medical review team]

Form"), which – although abbreviated – does in fact contain diagnoses, a prognosis of sorts, and

a brief indication of limitations. (R. 450-52). Dr. Anger's opinion that Plaintiff was "unable to

work at this time" due to psychiatric and physical limitations is on an issue reserved to the

Commissioner, and thus not binding upon the Secretary. 20 C.F.R. § 404.1527(d). However, at

minimum, the MRT form makes clear that Dr. Anger - Plaintiff's treating physician – believed

that Plaintiff's conditions had a significant and serious impact on his ability to function, and as to

duration, that these impairments would last at least one year. (R. 451). Dr. Anger also opined that

Plaintiff would need to avoid stressful work situations. Id. The form also contains diagnoses and

objective signs such as "flat affect/depressed," bilateral pain in the lumbar area, varicose veins

and swelling (edema) in his legs, and obesity. (R. 451). In a separate portion of the medical

evidence of record, there are years of Dr. Anger's treatment notes, including signs, symptoms,

diagnoses, and treatment. (R. 413-62). Thus, a significant amount of medical and some opinion

evidence from Plaintiff's *treating* physician has not been assigned a weight by the ALJ.

Further, there was no discussion or determination by the ALJ of whether, as a treating

source, Dr. Anger's opinion,[2] however limited, should be afforded controlling weight under 20

---

[2] If it qualifies as such – the ALJ is responsible for addressing the issue and making this determination.

C.F.R. §§ 1527(a)(2) and (b)(2). In so noting, the undersigned observes that the ALJ used the word "treated" to describe Plaintiff's longitudinal *mental* health treatment with Dr. Anger.[3] (R. 29). Thus, the ALJ acknowledged that Dr. Anger *was* Plaintiff's treating physician, as to both physical *and* mental complaints. While there may be valid bases for not affording Dr. Anger's evidence and opinions significant weight, the ALJ's decision does not even indicate that he considered weight as to Dr. Anger, nor was a weight specified. Further, the regulations provide that the Commissioner will not only evaluate the appropriate weight for this evidence, but "give good reasons [] for the weight we give your treating source's medical opinion." Id. This, too, the ALJ did not do.

### ii. Consultative Examiner Morgan, M.A.

Plaintiff argues that the ALJ afforded "inconsistent weight" to the consultative examiner, in that "that the ALJ accorded Mr. Morgan's opinion that he had "severely deficient" social functioning no weight at step three, but great weight in formulating the RFC (Pl.'s Br. at 9)." ECF No. 13 at 10. Defendant argues that a claimant's RFC is an administrative – not medical – finding that is reserved to the Commissioner. ECF No. 13 at 7. Defendant is correct on that point, but the overarching issue is that nowhere in the ALJ's decision did he "explicitly indicate[]" the weight given to Morgan's opinion. Gordon v. Schweiker, 725 F.2d 231, *235-36 (4th Cir. 1984).

Licensed Psychologist Morgan D. Morgan, M.A. conducted a consultative Mental Assessment for the Commissioner, which included a Mental Status Examination (MSE) and Clinical Interview (CI). (R. 523). This consisted of various recall tests, the Wechsler Adult Intelligence Scale (WAIS-IV), and Morgan's in-person interaction with, and observations of, Plaintiff. (R. 523-27). The ALJ's failure to specify and assign weight to Morgan is likewise in

---

[3] Though he mistakenly and erroneously identified the provider as the "Department of Human Services of Randolph County" (R. 30), the DHHR is not a mental health services provider. Instead, the ALJ was clearly referring to Arbor Medical, where Dr. Anger practiced.

violation of the Regulations. 20 C.F.R. § 404.1527(e)(2)(ii) ("Unless a treating source's opinion is given controlling weight, the administrative law judge *must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant*) (emphasis added). "Unless the Secretary has . . . sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Gordon v. Schweiker,</u> 725 F.2d 231, *236 (4th Cir. 1984) <u>citing</u> <u>Arnold v. Secretary</u>, 567 F.2d 258, 259 (4th Cir. 1977).

While it may be safe to say that the ALJ gave less weight to Morgan's opinion than he did to that of the agency reviewers (who were given great weight), it is unclear how much - whether Morgan's opinion was given no weight, little weight, some weight, or substantial weight. Some discussion of the matter will not suffice when the ALJ stops short of specifying the weight intended to assign. <u>Mascio v. Colvin</u>, 780 F.3d 632, *637 (4th Cir. 2015) (remand is necessary when the court "remain[s] uncertain as to what the ALJ intended"). Further, the ALJ's *reasons* for affording Morgan some lesser, unspecified weight would independently require remand.

> **b. The ALJ gave only one reason for discounting Morgan's opinion without discussing any of the numerous other factors he was required to consider per 20 C.F.R. § 404.1527.**

"Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. 20

C.F.R. § 404.1527 (2005)."[4] <u>Johnson v. Barnhart</u>, 434 F.3d 650, 654 (4th Cir. 2005). Here, the ALJ did not compare or even discuss the other factors in relation to his evaluation of Morgan's in-person consultative examination findings and opinions, versus agency reviewers Shaver and Capage's PRTs and MRFCs.

The ALJ stated "while the consultative examination is suggestive of potentially greater limitations than identified by the State agency consultants, the consultative examination is not buttressed by treatment records." (R. 30).[5] As to weight specifically, the ALJ appears to fault Morgan's opinion solely on the basis of supportability without mention of the other factors that definitely or arguably weigh in his favor. (The ALJ later credits the agency reviewers because they "independently reached identical conclusions" – but in actuality, they had not.)

And, as Plaintiff points out, the other factors are relevant. 20 C.F.R. § 404.1527(c)(1) directs that the Commissioner generally will "give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you." That factor, clearly, weighs in favor of Morgan. As to the other factors articulated in 20 C.F.R. § 404.1527(c)(6), Shaver, Capage, and Morgan are all agency consultants and examiners, and all thus presumably have a good understanding of the Commissioner's disability programs and evidentiary requirements. None of the three had a

---

[4] (ii) When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, the administrative law judge will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the **consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions**. Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us. 20 C.F.R. § 404.1527(e) (emphasis added).

[5] To the extent that Plaintiff appears to have interpreted this statement to mean Morgan was afforded less weight because he did not *have* treatment records, or have them to review in forming his opinion (ECF No. 11 at 6), the undersigned believes Plaintiff has misunderstood. Though the ALJ could have been more clear, certainly, it appears he meant to convey that Morgan's opinion did not have *support* from any treatment records. Merriam Webster's dictionary defines "buttressed" as "support[ed] or strengthen[ed]," which is most consistent with this interpretation.

treatment relationship with Plaintiff. While Plaintiff complains that Morgan's opinion was discredited because he did not have as much of Plaintiff's longitudinal treatment history as did the agency reviewers, (ECF No. 11 at 7), the undersigned did not interpret the ALJ to have stated that, because he did not address this factor.[6] (Indeed, as far as the ALJ was (erroneously) concerned, there *was* no mental health treatment history to speak of.) Additionally, the ALJ did not address (5) specialization, which could arguably weigh against one of the agency reviewers.[7] The ALJ's reliance on just one of the factors – a (perceived) lack of supportability – is insufficient. Forquer v. Colvin, No. 1:15-CV-57, 2016 WL 4250364 (N.D. W.Va. Aug. 11 2016) (An "ALJ cannot merely rely on . . . just one of the special factors").

Further, that determination is insufficient on other grounds as well, because the ALJ never explained *why* clinical evidence did not support Morgan's opinion. Although Defendant refers to support from "treatment notes," the question is actually whether there is support from *clinical evidence* in the record. And, as Plaintiff points out, the record does contain objective medical evidence[8] to the contrary from Plaintiff's treating physician:

> Here, Mr. Salisbury shows: anxiety/shaking of knees, treatment for major depression, flat affect, "increased anxiety," mood swings from anger to sadness, and anxiety is elevated. Tr. 497, 503, 547, 558, 562, 566, 572, 575, 580, 583, 587, 590, 596, 598, 601.
> Psychologist Morgan noted: minimal hygiene; significant body odor; disgruntled; clearly tense and uncomfortable; speech was at a mildly slow pace; mood: dysphoric, irritable, anxious; restricted affect; severely deficient recent recall; moderately deficient remote recall; mild concentration deficits based on DigitSpan testing; slow personal tempo; sullen; rigid posture; history of maladaptive personality features. Tr. 525-526.
> The ALJ's declaration that treating notes do not support Mr. Morgan is based on an incomplete review of the record.

---

[6] The ALJ noted that agency reviewers Shaver and Capage had *Morgan's* report in making *their* decision, but of course, Morgan also had the benefit of his own findings.

[7] Consultative examiner Morgan has a Master's degree and practices as a licensed psychologist. Reviewer Capage has a Ph.D., field unspecified. However, agency reviewer Shaver holds an Ed.D. – a doctorate in *education*. It is therefore unclear what his specialization in any field relevant to mental health treatment might be. (R. 126).

[8] DI POMS 24503.005 (B)(1) Objective Medical Evidence: Objective medical evidence means signs, laboratory findings, or both, from a medical source.

(ECF No. 14 at 4-5). Plaintiff argues that Morgan's findings are echoed in the treatment records of Plaintiff's treating physician (Dr. Anger), and thus it is actually those two sources whose opinions and evidence independently support each other – not agency reviewers Capage and Shaver's opinions, who are the outliers here. Defendant briefly states in a footnote that:

> The ALJ permissibly discounted Morgan's opinion because it was not supported by treatment records. 20 C.F.R. 404.1527, 416. 927; Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996) ("if a physician's opinion [treating or otherwise] is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight").

ECF No. 13 at 9. However, apart from that general statement reiterating the ALJ's position, Defendant does not directly address Plaintiff's argument that there *was* supportive evidence in the record that the ALJ ignored. Nor does Defendant argue that that there is any reason why it was proper for the ALJ to disregard without explanation the clinical evidence contained in this record.

It is important to be clear about what "clinical evidence" this record contains. SSA determined that the medical evidence in Plaintiff's record was insufficient to make a determination as to Plaintiff's mental impairments.[9] As a result, SSA ordered a consultative mental examination, performed by M.A. Morgan, which included various clinical tests – word, historical, and personal recall tests and the Wechsler Adult Intelligence Scale (WAIS-IV) – as well as a mental status examination ("MSE"). A mental status examination consists of an interview wherein the examiner observes the claimant for abnormalities (in appearance, attitude, behavior, mood and affect, speech, thought process and content, perception, cognition, insight, and judgment) that provide insight about a claimant's current mental state. But a mental status examination is only one type of clinical evidence that a record may contain. The record therefore

---

[9] Two consultative examinations were ordered – one for physical impairments, and one for mental impairments. The undersigned focuses on the mental CE for the purposes of this issue.

contained two sources of "clinical evidence" about Plaintiff's mental health issues: 1) Dr. Anger's regular, longitudinal treatment notes dating back to 2010 that document, and 2) the clinical evidence from Morgan's consultative examination.

It is true that an ALJ's determination as to the weight to be assigned to a medical opinion "generally will not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies,' or has failed to give a sufficient reason for the weight afforded a particular opinion." Dunn v. Colvin, 607 Fed.Appx. 264, 267 (4th Cir. 2015) (internal citations omitted). Here, however, the ALJ has done the latter. The ALJ first erred by not specifying what weight was assigned to Morgan in the first place. Second, inasmuch as the ALJ clearly discredited Morgan's opinion to some unknown extent, his rationale does not satisfy the regulations by relying on only one of numerous factors he was required to consider. Third, the ALJ failed to address - and it is entirely unclear - how he believed that the clinical evidence from Morgan and Dr. Anger, such as they were, did not support Morgan's opinion. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." Lewis, 858 F.3d at *869. The ALJ's determination therefore cannot be upheld.

## 2. The ALJ erred in his credibility analysis of Plaintiff.

The determination of whether a person is disabled by pain or other symptoms is a two-step process. See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1); SSR 96-7p. First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment[10] capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, once this threshold determination has

---

[10] Step one is fulfilled here. The ALJ in his decision stated that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . ." (R. 26). Thus, the Court addresses only Step Two.

been made, the ALJ considers the credibility of the subjective allegations in light of the entire record. Id.

Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of an individual's subjective symptoms. Id. In addition to medical evidence and a Plaintiff's statements, the factors include:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p. 1996 WL 374186 (July 2, 1996).

"The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are generally given great weight. Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). If the ALJ meets the basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08cv178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

The ALJ determined that Plaintiff's "credibility is hampered by a lack of treatment and ambivalence towards improving his physical complaints and mental complaints by rejecting sound advice of his physicians." (R. 27). In fact, the ALJ repeatedly cites Plaintiff's failure to maintain "consistent mental health counseling" as a determinative factor in his credibility finding. However, the ALJ failed to address whether Plaintiff's mental health treatment history was actually significant or not, or provide any reasons for so characterizing it in the face of years of evidence to the contrary. Because there is relevant contradictory evidence in the record that the ALJ has not addressed, the undersigned cannot find this determination to be supported by substantial evidence.

   a.  **The ALJ failed to explain why he considered Plaintiff to have had "virtually no mental health treatment," when Plaintiff had been receiving regular and longitudinal medication treatment since 2010 from his treating physician.**

Plaintiff argues that the ALJ incorrectly stated that "Mr. Salisbury did not show 'significant mental health treatment,'" since the record clearly shows longitudinal treatment with Dr. Anger for "PTSD, depression, and anxiety . . . via medication management of Celexa, Buspirone, Clonazepam, and Seroquel (ECF No. 11 at 8, citing transcript pages). Defendant is correct in asserting that an ALJ may consider the extent of a plaintiff's treatment, or the lack thereof, in making a credibility determination. Dunn v. Colvin, 607 Fed.Appx. 264 (4th Cir. 2015); SSR 96-7p. However, that fact is of little help to Defendant here, where the ALJ has done so in contravention of the directives of SSR 96-7p and in a manner that fails to satisfy his basic duty of explanation.

In his decision, the ALJ stated:

Turning to his alleged depression, anxiety, and PTSD, in September 2011, the claimant treated at Department of Human Services of Randolph County, and his anxiety was considered stable (Exhibit B5F/10). Subsequently, he had no mental health counseling

between September 2011 and his January 2014 consultative examination with Morgan Morgan, M.A. During the consultative examination, the claimant was diagnosed with major depressive disorder, recurrent, severe, without psychotic features full interepisode recovery; PTSD; and alcohol use disorder, moderate. As discussed above, the claimant exhibited significant abnormalities in social functioning, persistence, and pace, but the record reflects that he never followed up with consistent mental health counseling. In fact, he explicitly refused to go to counseling, with reflects ambivalence towards his symptoms and belies debilitating mental complaints (Exhibit B16/F41).

(R. 29). In this case, the ALJ's decision makes clear that the perceived "lack of mental health treatment" played a primary role in finding Plaintiff not entirely credible as to the severity of his mental health symptoms. This is echoed repeatedly throughout the ALJ's decision. (R. 24, "the claimant has had virtually no mental health treatment, which belies marked limitations in any domain," repeated a second time at R. 25;  R. 27, "the claimant's credibility is hampered by a lack of treatment and ambivalence towards improving his . . . mental complaints;" R. 29, "[Plaintiff's refusal] to go to counseling [] reflects ambivalence towards his symptoms and belies debilitating mental complaints;" R. 30, "If the claimant's mental complaints were as severe as he alleged than [sic] one would expect him to exhaust all modalities to relieve his symptoms.").

The record reflects that Plaintiff's history of mental treatment apparently began in 2009, when he was admitted to Chestnut Ridge for inpatient treatment of depression following a suicide attempt by overdose. (R. 524). After his release, Plaintiff continued to receive outpatient psychiatric services at Chestnut Ridge (R. 524) for a "couple of years" pursuant to posttraumatic stress disorder after discovering his wife's body following her suicide. (R. 432). In 2010, Dr. Anger directed Plaintiff to continue to follow with Chestnut Ridge for mental health treatment. Id. It is noted that Plaintiff's "most recent counseling was in Morgantown." (R. 491). In February 2013, Plaintiff told Dr. Anger that he did not want to attend counseling at that point, because "he has trouble being around people." (R. 491). However, Plaintiff continued to see Dr. Anger regularly – every few months – from 2010 onward for medications for his mental health issues.

Beyond just mechanical refills, Dr. Anger regularly made adjustments to Plaintiff's medications over the years – starting him on Zoloft (R. 421), increasing his dosage of Seroquel when his depression was worse (R. 429, 454), and trying him on Celexa when his anxiety was worse, (R. 497), among others.

It is not disputed that Plaintiff was not receiving *counseling* at that point, although he has apparently gone to counseling in the past. (This, too, the ALJ does not mention.) Defendant admits in her brief that Plaintiff "did not seek treatment for psychological symptoms, *other* than medication management" – thus apparently conceding that Plaintiff did have *some* mental health treatment, even if not counseling at that time. (ECF No. 13 at 9). Defendant did not explicitly argue that the mental health treatment that *is* reflected in the record should *not* be considered significant in its own right, or should be discounted for some reason. The question is essentially whether a failure to pursue just one modality of treatment can fairly permit the ALJ to characterize an otherwise lengthy and extensive treatment history in a different modality as "virtually no[nexistent]" or "insignificant." However, Defendant argues only that in credibility determinations, conservative treatment is a factor the ALJ may consider. Defendant misses the point: the ALJ permissibly considered the lack of more extensive treatment (but did so incompletely);[11] the ALJ *also* did not explain why he dismissed what treatment Plaintiff *did* have, ignoring evidence to the contrary.

---

[11] Even if the ALJ's rationale was not deficient on the basis of inaccurately characterizing Plaintiff to have had "virtually no mental health treatment," the ALJ's rationale appears to also be deficient under SSR 96-7p. That is, the Regulations "warn[] that an ALJ must 'not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanation that the individual may provide, or other information in the case record." SSR 96-7p; Davis v. Commissioner, 2015 WL 105974, No. 5:14-CV-83, at *32 (N.D.W.V. Jan. 7, 2015), citing Craft v. Astrue, 539 F.3d 668, 679 (7th Cir. 2008). Though the case record clearly contains two such explanations, the ALJ does not mention or discuss either prior to drawing precisely the types of inferences SSR 96-7p prohibits.

First, Plaintiff told Dr. Anger in February 2013 that he did not want to attend counseling because "he has trouble being around people." (R. 491). In addition to his own self reports, Plaintiff's difficulty interacting appropriately with others and antisocial behavior was documented by the agency consultant who interacted with

Defendant's further argument on this point is unclear. Defendant states in a footnote that:

> [T]he records from Plaintiff's medication management do not contain mental status examination results (Tr. 544-85). See generally Vokes v. Colvin, No. CIV A. 12-1662, 2014 WL 45763, at *4 (W.D. Pa. Feb. 4, 2014) ("as Dr. Handley's opinion relied on plaintiff's subjective complaints, the ALJ committed no error in considering plaintiff's lack of treatment in evaluating it."

(ECF No. 13 at 10).

To the extent Defendant appears to be arguing that treatment notes from Dr. Anger do not support Morgan's opinion because they do not contain mental status examination results, Defendant fails to elaborate what if any relevance that has here. Further, Vokes does not assist in clarifying on this point. In Vokes, an ALJ rejected a consultative examiner's (Dr. Handley) opinion because there was "little evidence that [she] relied on anything *but* plaintiff's own

---

him, M.A. Morgan, with whom Plaintiff was "sullen, and apparently disgruntled at being here." (R. 523). Morgan identified objective symptoms of "maladaptive personality features." Id.

Second, Plaintiff explained that he "cannot go [to Chestnut Ridge in Morgantown] all the time." (R. 584). It takes "about two hours" to drive to Morgantown (where Chestnut Ridge is located) from Plaintiff's home (approximately one hundred miles), and Plaintiff testified before the ALJ as to his dependency on others for transportation. Plaintiff had occasionally driven his camper "about three miles" to the store once a week, though at the time of the hearing, Plaintiff estimated it had been "six months or so" since he'd driven. (R. 47). More recently, Plaintiff had been relying instead on his cousin and ex-brother-in-law to go to the store for him and take him to appointments. (R. 47-48). Plaintiff was driven by family members to the hearing before the ALJ. (R. 47).

However, Plaintiff continued to avail himself regularly of treatment that did not pose those problems, and regularly had his medications adjusted in attempts to lessen the symptoms of his anxiety, depression, and PTSD. With all of this this evidence in the record, the ALJ had an obligation to resolve ambiguities or inconsistencies, and to explain how he did so. 20 C.F.R. § 416.929 ("We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence"). There is thus evidence in the record to consider both of Plaintiff's reasons for avoiding counseling to be viable explanations under 96-7p, which required – at minimum - the ALJ's exploration and evaluation before he reached conclusions about Plaintiff's lack of counseling. SSR 96-7p also mandates that:

> [An] adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment **without first considering any explanations that the individual may provide, or other information in the case record, that may explain** infrequent or irregular medical visits or **failure to seek medical treatment**. **The adjudicator may need to** recontact the individual or **question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment**.

Yet, at the hearing, the ALJ did not question any of Plaintiff's mental health treatment history, attempt to resolve any ambiguities in the record as to the extent of the treatment, or make any attempt to develop the record or inquire further as to his reasons for failing to attend counseling. Instead, the ALJ devoted a significant portion of the hearing to questioning Plaintiff repeatedly about how much he drinks, smokes, and drives, and does laundry.

reported symptoms," and the "extreme limitations" in her report were "not supported by her own mental status report." Id. at *3. Plaintiff's situation here is quite distinct.

First, CE Morgan's opinion was *not* based solely on Plaintiff's own subjective, self-reported symptoms, unlike in Vokes:

> In regard to memory, Dr. Handley wrote that "[plaintiff] said" she remembers some remote memory and her past memory is "'not good'" and that "she said her short term memory is terrible." (R. 296). Likewise, in section VII of the report entitled "effect of impairment of function", Dr. Handley again reports only that "[plaintiff] said" and "[plaintiff] stated" when discussing how her impairment affects her activities of daily living, social functioning and concentration, persistence and pace." (R. 298). Accordingly . . . there is little evidence in the report that Dr. Handley relied on anything but plaintiff's own reported symptoms.

Id. at *3. Here, CE Morgan did not simply ask Plaintiff a series of questions. CE Morgan conducted a Mental Assessment, including a Mental Status Examination (MSE) and Clinical Interview (CI), as well as various recall tests and the Wechsler Adult Intelligence Scale (WAIS-IV). (R. 523-27). Morgan cited to the results of these tests and objective symptoms in his report as the bases for his opinion, *in addition to* his own in-person interaction with, and observations of, Plaintiff. Id. Morgan did not simply ask Plaintiff how his memory was; he administered a series of word, historical, and personal recall tests to assess immediate, recent, and remote memory. (R. 525). Morgan did not simply ask Plaintiff how his concentration was; he administered the Digit Span subtest of the WAIS-IV, and Plaintiff's scaled score of seven (7) on that test informed Morgan's opinion. (R. 526). Morgan did not simply ask Plaintiff how his pace was; he observed objective symptoms of tempo in forming his opinion. Id. In forming his opinion as to social functioning, Morgan relied in part on Plaintiff's statements as to his social life, romantic life, and interactions with others (indeed, it is difficult to ascertain how else he would possibly be able to obtain that information without relying on self-reports), but *also* relied on his own personal interaction with Plaintiff and objective symptoms, including a "sullen,

disgruntled, and dysphoric" presentation. (R. 527). In actuality, Morgan relied on significantly more than Plaintiff's own reported symptoms.

Second, unlike Dr. Handley, whose mental status examination results were found to contradict her opinion, Defendant has not pointed to anything in Morgan's mental status examination that contradicts his opinion, nor is anything contradictor apparent to the undersigned. (Indeed, Morgan's are the *only* such tests contained in this record; there are no other administrations of these tests that produced conflicting results.) <u>Vokes</u> thus provides no support for Defendant here.[12] If anything, <u>Vokes</u> aids the Plaintiff.

In summary, the record reflects that Plaintiff had a longitudinal mental health treatment with Dr. Anger, who he saw regularly since 2010, and who regularly stopped, started, or adjusted Plaintiff's medications for depression and anxiety in attempts to treat Plaintiff's diagnosed affective disorders and his symptoms. The ALJ failed to explain why he considered Plaintiff to have had a "lack of mental health treatment" or "no significant mental health treatment" in the face of this longitudinal mental health treatment history – dating back to at least 2010. There was only one modality of treatment that Plaintiff was not currently pursuing (and he provided at least two reasons for doing so which the ALJ failed to address as he was required to do). Under these circumstances, the undersigned cannot conclude that Plaintiff's mental health treatment was fairly or accurately characterized by the ALJ, and thus his primary reason for discrediting Plaintiff is invalid.

---

[12] The ALJ also discounted the opinion of Vokes' primary care physician, Dr. Humphrey, because he opined as to plaintiff's *physical* impairments only, and not to mental impairments. Unlike Dr. Humphrey, Dr. Anger *did* opine (though briefly) on Plaintiff's mental limitations, in addition to treating him for mental health issues for many years. That opinion contained "diagnos[e]s, [a] prognosis, and [a] medical opinion" (SSR 96-7p) on at least one issue.

**b. The ALJ discredited Plaintiff in large part due to a perceived lack of treatment, without discussing the other factors in SSR 96-7p.**

Of the factors the ALJ was required to consider (other than medical evidence and Plaintiff's statements) articulated in SSR 96-7p, the ALJ recognized that Plaintiff's activities of daily living (factor one) were limited, but dismissed that as more likely due to physical rather than mental factors. In the credibility determination, the ALJ did not appear to discuss factors two, three, four, six, or seven. Of particular relevance is the fact that Plaintiff took numerous medications for his depression, anxiety, and PTSD and that they were regularly adjusted, as to factor four. As already discussed, Dr. Anger made a number of changes to Plaintiff's depression, anxiety, and PTSD medication when they were *not* working to control his symptoms. In addition, SSR 96-7p also provides in relevant part that:

> Assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to:
>> The medical signs and laboratory findings;
>> Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and
>> Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

Because the ALJ improperly discounted and failed to assign weight to the diagnoses, prognoses, opinions and the medical signs documented throughout the record from Dr. Anger and CE Morgan, he did not properly base his credibility determination on an adequate "consideration of all the evidence in the case record." Id. He did not address the consistency in Plaintiff's reports of his symptoms to a number of medical sources and limiting effects documented over the years, or properly address Plaintiff's mental health treatment history. SSR 96-7p (in particular, "the

consistency of the individual's own statements . . . especially important are statements made to treating or examining medical sources," and "a *longitudinal record* of *any treatment* and it success or failure . . . [as] longitudinal records showing *regular contact with a treating source* are the most desirable") (emphasis added).

The undersigned further observes that the initial and reconsideration disability determinations, the contents of which the ALJ assigned great weight general, *both* contain statements that Plaintiff *was* fully credible, *by the medical evidence alone*, in contrast to the ALJ's finding:

> Are the individual's statements about the intensity, persistence, and functionally limiting effects of the symptoms substantiated by the objective medical evidence alone?
> **Yes.**

(R. 93 (initial) and R. 142 (reconsideration) (emphasis added)).

### 3. The ALJ's rationales as to Plaintiff's limitations in Social Functioning and Concentration are factually inaccurate and logically flawed.

In deciding that Plaintiff had moderate, rather than marked, difficulties in social functioning, the ALJ gave three reasons: 1) two agency reviewers independently reached "identical conclusions" on this point; 2) the consultative examiner's opinion that Plaintiff's social functioning was "severely deficient" did not necessarily mean that it was "markedly deficient;" and 3) Plaintiff had "virtually no mental health treatment." (R. 24).

In deciding that Plaintiff had Plaintiff had moderate, rather than marked, difficulties in concentration, the ALJ gave similar reasons: 1) the two agency reviewers independently reached "identical conclusions" on this point; 2) "Severely deficient" did not necessarily mean "markedly deficient," in this case because "the mean of [Morgan's assessment] of mildly deficient concentration and severely deficient persistence and pace could be considered moderate limitations;" and 3) Plaintiff had "virtually no mental health treatment." (R. 24-25). As already

discussed, the third reason – lack of mental health treatment – is invalid. The ALJ's other two reasons are also invalid, for the following reasons.

### a. Agency reviewers did *not* reach completely "identical conclusions" with regard to Plaintiff's social functioning or concentration.

This issue is relevant to the ALJ's rationale as to weight generally, but is also relevant specifically to Plaintiff's complaint that the agency reviewer "merely signed off" on the prior opinion - begging the question, *were* the opinions of the agency reviewers identical? In his decision, the ALJ reasoned that:

> The claimant certainly has significant limitations in social functioning, but the state agency consultants were again in agreement with regard to the degree of limitations in this domain, both finding only moderate difficulty. The fact that these two experts prepared independent reports and both reached identical conclusions lends credibility to each assessment.

(R. 24). That is true only if one looks no further than the Psychiatric Review Techniques, while ignoring the Mental Residual Functional Capacity assessments that these reviewers completed. While reviewers Shaver and Capage ultimately both found overall limits in the broad category of social functioning to be "moderate" in social functioning on the PRTs, social functioning is comprised of a series of more specific variables that are listed in the MRFCs. And while some of those categories were rated the same by both agency reviewers, their findings differ significantly as to Plaintiff's "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness." Here, reviewer Shaver found that Plaintiff had *no* significant limitations. (R. 97). However, reviewer Capage found that Plaintiff had *moderate* limitations. (R. 146). Further, social functioning was not the only area in which the agency reviewers differed. As to concentration, Shaver found Plaintiff had no significant limitations on his ability to carry out detailed instructions (R. 96), while Capage found moderate limitations (R.

146). These are not insignificant divergences on these points, especially in light of the fact that there is quite a gap between no limitations and moderate limitations.

While it is true that neither reviewer found more than moderate limitations in social functioning, concentration, persistence, or pace, that is not the point. The point is that the ALJ *cited* the agency reviewers' "identical" conclusions as a reason for finding the agency reviewers to be more credible on these two points than CE Morgan. Because those conclusions were *not* identical, the basis for the ALJ's first reason for crediting the agency reviewers is factually and logically flawed. Further, while these unexplained differences in opinion on certain issues between the two reviewers undermines the ALJ's first reason for finding them more credible, the differences also render Plaintiff's argument that Capage "merely signed off" on Shaver's opinion without merit.[13]

### b. Morgan clearly used the phrase "severely deficient" to convey limitations that were more than moderate.

20 C.F.R Part 404, Subpart P, Appendix 1, § 12.00(F)(2) explains how imitations are expressed categorically for the purpose of evaluating paragraph B criteria:

> *2. The five-point rating scale.* We evaluate the effects of your mental disorder on each of the four areas of mental functioning based on a five-point rating scale consisting of none, mild, moderate, marked, and extreme limitation. To satisfy the paragraph B criteria, your mental disorder must result in extreme limitation of one, or marked limitation of two, paragraph B areas of mental functioning. Under these listings, the five rating points are defined as follows:
> 1. *No limitation (or none).* You are able to function in this area independently, appropriately, effectively, and on a sustained basis.
> 2. *Mild limitation.* Your functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.
> 3. *Moderate limitation.* Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.

---

[13] Even if it did not, <u>Murphy</u>'s decision on that issue was tied more to deference to the ALJ than it was to the physicians. Thus, <u>Murphy</u> does not aid Plaintiff here because the ALJ did not determine that the second reviewer had merely signed off on the first reviewer's opinion. If the undersigned were to follow <u>Murphy</u> and defer to the ALJ, it would be upholding a determination unfavorable to the Plaintiff. This argument thus fails.

4. *Marked limitation.* Your functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.
5. *Extreme limitation.* You are not able to function in this area independently, appropriately, effectively, and on a sustained basis.

Plaintiff argues that the ALJ improperly minimized the severity of Plaintiff's limitations by making arbitrary distinctions between "severe" and "marked" (ECF No. 11 at 10). Here, as to social functioning, the ALJ recognized that the agency reviewers' opinions "were somewhat inconsistent with the consultative examination, but severely deficient does not necessarily equate to markedly deficient." (R. 24). The ALJ provided the same rationale for concentration, persistence, or pace. (R. 25). Defendant argues that even if competing interpretations are possible, the ALJ's interpretation here was reasonable and thus should be given deference. The argument is, as framed by the parties, essentially one of interpretation. However, it is unnecessary to guess as to whether what Morgan meant by "severely deficient" could reasonably equate to what the ALJ considered "moderate" limitations, because Morgan's opinion clearly shows he considered Plaintiff's limitations to be more than moderate in nature.

First, Morgan completed a consultative mental assessment of Plaintiff pursuant to his application for disability, at the request of SSA. Consultative examiners, like agency reviewers, are by the Commissioner's own publications familiar with social security programs and are experienced at writing reports sufficient for SSA disability evaluation purposes ("Medical sources who perform CEs must have a good understanding of SSA's disability programs and their evidence requirements").[14] One need only read Morgan's report to realize that Morgan expressed his opinions on limitations throughout his report consistently and generally in SSA terms. When Morgan found no significant limitations, he described them as "within normal

[14] Social Security Administration. *Consultative Examinations: A Guide for Health Professionals ("Green Book"). Part III: Consultative Examination Guidelines - Selection of a Consultative Examination Source.* (April 2014). https://www.ssa.gov/disability/professionals/greenbook/ce-guidelines.htm (last visited November 14, 2017).

limits." (e.g., R. 526, "immediate recall was within normal limits"). When Morgan found mild limitations, he described them as "mild." (e.g., Id., "concentration was mildly deficient"). When Morgan found that Plaintiff had moderate limitations in certain areas, he described them as "moderate." (R. 525, "insights were deemed to be moderately deficient;" R. 526, "remote recall was observed to be moderately deficient"). And when Morgan found limitations to be *more* than moderate, he described those limitations as severe. (R. 527, "overall social functioning was deemed to be <u>severely</u> deficient;" "Persistence: <u>severely</u> deficient;" and "pace was observed to be <u>severely</u> deficient").

If Morgan felt that Plaintiff's limitations in social functioning, persistence, and pace were no more than moderate, Morgan would have described them as moderate - just as he did for insight or remote recall. Morgan described Plaintiff's limitations as "severely deficient" because in his opinion Plaintiff was *more than moderately limited in those areas*. The only rational question of interpretation that might warrant deference would therefore be whether Morgan meant that Plaintiff's limitations were marked or extreme. Given Morgan's report, there is no rational interpretation that supports the ALJ's position that "severely deficient" could plausibly equate to a "moderate" limitation here. Accordingly, the court will decline to defer to the ALJ's interpretation. The ALJ's second reason for crediting the agency reviewers is likewise flawed.

As to Plaintiff's argument that the ALJ improperly attempted to "average out" the limitations found by Morgan in order to reconcile them with the limitations found by the agency reviewers, the undersigned agrees. Defendant did not appear to directly address this issue, responding generally that the court was required to defer to any rational interpretation. The undersigned finds no supportable logic to the proposition that Morgan's findings of mildly deficient concentration and severely deficient persistence and pace could fairly be considered to

equate to "moderate" limitations across the entire category when averaged – if for no other reason that two "severe" limitations and one "mild" limitations would result in something greater than moderate purely as a matter of averages. (That is, the idea that the limitations could average to "moderate" would be logical only if there was one severe limitation and one mild limitation - not the case here.)

The last rationale, that Defendant had virtually no mental health treatment, remains invalid for the purpose of the RFC for the same reasons as already addressed at length for the purpose of weight.

   **c.** **Because none of the reasons the ALJ provided for finding only moderate limitations in social functioning, persistence and pace withstand scrutiny, the mental RFC formulated by the ALJ on those bases cannot be found to adequately account for Plaintiff's restrictions.**

Defendant argues that, regardless of any issues with the ALJ's rationale, such error is ultimately harmless because the RFC he formulated adequately accounts for Plaintiff's mental restrictions. (ECF No. 13 at 14, fn. 5). Plaintiff disagrees, noting that 1) merely limiting Plaintiff's exposure to irritants does not properly account for his *exertional* COPD, and 2) even if the court finds that the RFC permissibly accounted for social functioning, the RFC did not provide for his moderate impairment in concentration. (ECF No. 11 at 13-14), citing Mascio v. Colvin. Plaintiff further argues that the RFC contains a sit/stand option that has no apparent basis in any medical evidence or testimony, while Defendant argues that it is not *required* to be based on medical evidence and Plaintiff has not established that he has greater restrictions than that in any event.

When assessing a claimant's RFC, the Social Security Ruling 96-8p  requires an ALJ to "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis."  Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir.

2015). The RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Mascio, 780 F.3d at 636 (citation omitted). A discussion of the functional limitations in broad terms followed by an in-depth analysis supporting the ALJ's function findings will satisfy the regulations requirement as well. See Ashby v. Colvin, 2015 WL 1481625, at *2 (S.D.W. Va. Mar. 31, 2015).

Here, the ALJ stated:

There is nothing in the consultative examination or limited treatment records that suggests [Plaintiff] would be unable to perform simple tasks so long as his work environment accommodated his severely deficient social functioning by requiring no interaction with the public and only occasional interaction with coworkers and supervisors.

(R. 29). Of course, there *is* something in the consultative examination that suggests precisely that: Morgan found that Plaintiff's persistence and pace[15] were also severely deficient, an opinion discredited by the ALJ on invalid bases.

Defendant argues that Marshall v. Colvin, Case No. 1:14-CV-542, 2016 WL 5660295 (M.D.N.C. Sept. 30, 2016) distinguishing Mascio, is more applicable here. In Mascio, the Fourth Circuit held that "an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." Id. at 638. In Marshall, the ALJ was upheld because in addition to simple routine tasks, his hypothetical also limited the plaintiff to "simple, short instructions; simple work-related decisions, few work place changes, no work at [a] fixed production rate or pace; occasional interaction [with the] general public, co-workers, and supervisors." Id. at *3. Here, the ALJ limited Plaintiff to "simple, routine, and repetitive tasks requiring only simple decisions with no

---

[15] For this reason, Defendant's arguments regarding the DOT (ECF No. 13 at 12) and interaction are unpersuasive, because it is not just Plaintiff's social functioning that is at issue.

fast pace production requirements and few workplace changes; . . . [with] no interaction with the public and only occasional interaction with coworkers and supervisors." (R. 65). It would therefore appear that the ALJ has attempted to account for concentration or persistence to some extent ("simple routine tasks requiring only simple decisions"), pace limitations (no fact pace production requirements), and social functioning limitations (interaction limits). Plaintiff argues, however, that time on task was not properly included.

Although the ALJ asked the VE about customary tolerances for time off task ("10 percent at the workstation[; t]ermination if exceeded" (R. 66)), the undersigned did not locate any finding in the decision as to whether Plaintiff would be off task and if so, how long – more or less than ten percent of the time, and whether based on physical limitations (as would seem to be suggested by the sit/stand option) or due to concentration, persistence, or pace (which is not discussed). Or, if he found that Plaintiff would *not* be off task for physical or mental limitation reasons, to explain why (especially in light of conflicting evidence in the record).See 12.00(E)(3) ("Concentrate, persist, or maintain pace (paragraph B3). This area of mental functioning refers to the abilities to focus attention on work activities and stay on task at a sustained rate").

However, because the case must be remanded for correction of the weight and limitations analysis in the first instance, should Morgan's opinion be found to carry more weight when properly analyzed – or the agency reviewers less – the current RFC would not suffice**.** In fact, as none of the reasons provided by the ALJ for discounting Morgan's opinion were supported by substantial evidence, it is possible that upon reconsideration Plaintiff may meet or equal listing 12.04 or 12.06.[16] Accordingly, under these circumstances, the undersigned cannot

---

[16] The Paragraph A criteria for these conditions were satisfied; however, the ALJ found that the Paragraph B criteria were not satisfied, because the limitations were (erroneously found to be) not more than moderate in any of the four categories. However, Morgan opined Plaintiff's limitations in at least two categories – concentration, persistence or pace, and social functioning – were severely deficient and caused more than moderate limitations.

say that this error was harmless, or find that the existing mental RFC properly accounts for Plaintiff's limitations despite the errors below.[17]

### 4. Plaintiff's argument with regard to reopening fails.

Plaintiff argues that the ALJ erred by "de facto opening" a prior adjudicated claim in providing a consultative examination from 2009 (pursuant to a prior application) to examiner Morgan. ECF No. 11 at 7. Defendant argues that the ALJ's actions do not constitute a reopening, and even if they did, Plaintiff has waived the argument by presenting it conclusorily. ECF No. 13 at 14. Lastly, Defendant argues that Fourth Circuit precedent precludes Plaintiff's argument as more than four years have passed. Id.

An administrative determination may be reopened for any reason within twelve months of the date of the notice of the initial determination, or within four years of the date of the notice of the initial determination upon finding good cause for reopening. 20 C.F.R. §404.988. Good cause for reopening a case will be found if "(1) new and material evidence is furnished; (2) a clerical error was made; or (3) the evidence that was considered in making the determination or decision clearly shows on its face that an error was made." 20 C.F.R. §416.1489.

---

[17] Further, Plaintiff's other arguments regarding the RFC would also require further elaboration from the ALJ, *if* the five-step process does not terminate prior to that point upon reconsideration. Upon reconsideration, explanation should be made as to osteoarthritis and time off task, elaborating how those issues were accounted for in the RFC (or if not, why not).

As to arthritis, Plaintiff argues that the RFC does not adequately explain what limitations account for Plaintiff's arthritis. This, too, requires explanation – particularly in light of the fact that the ALJ stated: "The consultative examiner diagnosed chronic cervical and lumbar strain and degenerative arthritis, but the aforementioned physical findings do not suggest debilitating *back* pain." (R. 28) (emphasis added). Problematically, Plaintiff's arthritis was in his *knee*.

As to COPD, the ALJ noted that Plaintiff's COPD was "adequately accommodated by the exertional and environmental [limitations] in the [RFC]," but does not elaborate further as to which evidence in the record that he would cite to for this assertion. His explanation likewise suggests that COPD has *not* figured into the *exertional* limitations. The ALJ cites "obesity and his chronic lumbar strain" in limiting to light work, "lumbar range of motion and obesity" in limiting postural movements no more than occasionally, and the ability to "stand on each leg independently" in finding Plaintiff could walk and stand for six hours per day. (R. 30). COPD was not mentioned once in the exertional limitations, only with regard to environmental limitations: "I also find that the claimant should avoid certain environmental exposures due to COPD and obstructive sleep apnea." (R. 23). If there was some reason the ALJ found Plaintiff's COPD to have no contribution to his *exertional* limitations despite the complaints and symptoms in the record, he failed to make that clear.

"Jurisdiction to review exists when, even though the Secretary has purported to rest denial of reopening on principles of administrative res judicata, a review of the record discloses that the merits of the claim actually have been reconsidered. Under these limited circumstances, the claim is "properly treated as having been, to that extent, reopened as a matter of administrative discretion under 20 C.F.R. § 404.989." Hall v. Chater, 52 F.3d 518 (4th Cir. 1995) citing McGowen v. Harris, 666 F.2d 60, 65. (4th Cir.1981). But here, Plaintiff has not explained how he believes the *merits* have been re-evaluated, and it is not apparent. The prior consultative examination appears to have been used essentially as a historical reference; at no point does this record indicate that the merits of the prior adjudicated claim were being reconsidered. And the ALJ was also clear that:

> Because the time period from October 14, 2008, through May 2, 2011, has already been addressed by a previous Administrative Law Judge, and because **I have found no new and material evidence or other basis sufficient to establish "good cause" for reopening or revising that prior determination**, I will consider only the time period from May 2, 2011, to the present as the time period at issue in this decision (see 20 CFR § 416.1487 et seq.; see also 20 CFR 416.335 and 20 CFR 416.912(d)).

(R. 19-20). Accordingly, the undersigned is of the opinion that this argument is without merit.

## VII.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income **IS NOT** supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 10) be **GRANTED** as to Plaintiff's claims, Defendant's Motion for Summary Judgment (ECF No. 12) be **DENIED**, and the decision of the Commissioner be vacated and this case be **REMANDED** for correction of these errors.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions

of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Gina M. Groh, Chief, United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Additionally, as this report and recommendation concludes the referral from the District Court, the Clerk is further **DIRECTED** to terminate the magistrate judge's association with this case.

Respectfully submitted this November 15, 2017.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE